USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __1/21/2025__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EXIST INC.,

Plaintiff,

-against-

TOKIO MARINE AMERICA INSURANCE
COMPANY,

Defendant.

22 Civ. 1679 (AT)

**OPINION AND ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Exist Inc. ("Exist"), an apparel wholesaler, brings this action against Defendant,

Tokio Marine America Insurance Company ("Tokio Marine"), for breach of an insurance policy

following a flood at an Exist warehouse. *See generally* Compl., ECF No. 1. Before the Court are the

parties' cross-motions for summary judgment. ECF Nos. 63, 69; *see also* Pl. Mem., ECF No. 64;

Def. Mem., ECF No. 72; Pl. Reply, ECF No. 75; Def. Reply, ECF No. 79. For the reasons stated

below, the motions are GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

I.   Factual Background

A.  The Policy

Exist is a wholesale clothing importer and distributor. *See* Pl. 56.1 ¶ 1, ECF No. 66. In

February 2019, Exist and Tokio Marine entered into an insurance policy (the "Policy"), *id.* ¶ 4; Policy

at 2, ECF No. 65-2,[1] which insured Exist's Fort Lauderdale, Florida warehouse (the "warehouse")

and the merchandise therein against "all risks of physical loss or damage from any external cause,"

including floods, Pl. 56.1 ¶¶ 6–8; Policy at 3–5. The Policy required Exist to give "prompt notice" to

Tokio Marine "[i]n the event of [a] loss which may give rise to a claim under th[e] Policy." Policy at

---

[1] Citations to the Policy are to the ECF page number.

47. "Proof of [any] loss [was] to be authenticated by" an agent of Tokio Marine, and insurance proceeds were to be paid within "thirty days after proof of loss, proof of interest, and adjustment" of Exist's claim. *Id.*

Under the Policy, Exist was to retain control over damaged goods and sell them, or have them "destroyed":

> It is agreed that in the event of damage to goods insured under th[e] [P]olicy, [Exist] shall retain control of all damaged goods. [Exist], however, agrees whenever practicable to recondition and sell such goods after removal of all brands and trademarks, [Tokio Marine] being entitled to the proceeds from such sale. It is further agreed [Tokio Marine] will be consulted and allowed to inspect any damaged goods prior to any disposal or sales of such property.

> Where it is agreed by both [Exist] and [Tokio Marine] that the disposal or sale of such damaged goods is detrimental to [Exist's] interest (or which [Exist] will be unable to sell or dispose of under [its] agreement with any trade associations) such damage will be treated as a constructive total loss, and the goods shall be destroyed in the presence of a representative of [Tokio Marine].

*Id.* at 46.

The Policy also specified how damaged goods were to be valued for the purposes of payment on a claim:

> Goods and/or merchandise shall be valued and insured for the invoiced purchase price[,] plus any prepaid and/or guaranteed freight if not included in the original purchase invoice[,] plus 10%[,] plus any import duty payable on arrival into the United States; if sold, valued at [Exist's] selling price less un-incurred charges, costs[,] expenses[,] and discounts.

*Id.* at 4. In other words, if an item had been imported by Exist but not yet sold when it was damaged, Exist was entitled to the amount it paid to purchase and import the item. If Exist had sold the item but not yet shipped it to the customer when it was damaged, Exist was entitled to the item's sale price less any costs not incurred, such as shipping or, in the case of custom-ordered clothing, costs associated with embroidery, silk screening, embellishment, or other customizable features. The Court

refers to these two categories of damaged goods as "Imported Goods" and "Sold Goods," respectively.

The Policy contained a "Choice of Law" clause, which provided that "the law applicable to any interpretation of th[e] [P]olicy and the rights and obligations of [Tokio Marine] and [Exist] shall be . . . federal common law or, in the absence of [such] federal maritime common law, the laws of the State of New York, irrespective of any principles of choice of law." *Id.* at 51. The Policy further provided that "[n]o suit, action[,] or proceeding against [Tokio Marine] for the recovery of any claim shall be sustainable unless commenced within one year from the date of the happening of the accident out of which the claim arises." *Id.*

### B. Exist's Claim and the Inventorying of Damaged Goods

On December 19, 2019, a flood occurred at the warehouse. Def. 56.1 ¶ 5, ECF No. 73. Following the flood, Exist staff inspected, counted, and moved damaged merchandise to a segregated area. Poston Depo. ("Poston") at 19:5–25, ECF No. 65-3; Pl. 56.1 ¶ 14. Exist counted 366,411 damaged items, which it determined amounted to a "total retail value" of $2,621,952.71. Pl. 56.1 ¶¶ 15–16. About a week after the flood, Exist notified Tokio Marine of the incident and Tokio Marine retained Ralph Wood, "an independent surveyor," to conduct a physical inspection of the warehouse and the damaged goods on Tokio Marine's behalf. Quinn Depo. ("Quinn") at 37:6–9, ECF No. 65-1; Pl. 56.1 ¶¶ 13, 19; Def. 56.1 ¶¶ 10–11.

On February 18, 2020, Crystal Lopez, Exist's public adjuster, emailed Patricia Quinn, a representative of Tokio Marine, a copy of Exist's inventory of damaged items (the "Exist Inventory"). ECF No. 65-5 at 10. Quinn responded the following day, asking to schedule a date for the damaged items to "be inspected for verification." *Id.* at 9. A few days later, Wood informed Lopez that his office could not "handle the inventory in a timely or effective manner" due to "the damages and quantity of product involved." *Id.* at 6. Wood told Lopez that he had recommended to

Tokio Marine that it "retain a company that specializes in handling such matters," and that he and Tokio Marine had "agreed that Belfor Property Restoration [("Belfor")] . . . [be] retained" to authenticate Exist's loss and take an inventory of the damaged items. *Id.*; *see also* Quinn at 57:18–23, 58:25–59:3.

On March 2, 2020, Belfor and Exist representatives met with Wood at the warehouse. Pl. 56.1 ¶ 17; ECF No. 65-5 at 1. After the meeting, Belfor representative Paul Konen emailed Wood and Exist, stating that beginning on March 7, 2020, "Belfor [would] [i]nventory all water-damaged goods" at the warehouse; the inventory would list the quantity, style number, color, and container location of each damaged good, as well as whether each good was "[e]mbellished" or "[u]nembellished"; and "Exist [would] designate two employees to assist Belfor with access and any questions [Belfor] may have about the goods."[2] ECF No. 65-5 at 1. Konen further stated that "Belfor [would] dispose of inventoried goods into dumpsters onsite," which Belfor would "have delivered" and "swapped when full." *Id.*

Belfor hired two companies to inventory and remove the damaged items. Def. 56.1 ¶¶ 19–20. The first company, Oceanside Labor ("Oceanside"), was retained by Belfor to carry out the inventorying. *Id.* ¶ 19; Konen Depo. ("Konen") at 44:14–21, ECF No. 65-6. Oceanside hired "independent contractors" to do the physical work of removing damaged items from storage containers, counting and inventorying the items, and discarding them. Carr Depo. ("Carr") at 26:6–7, ECF No. 65-7; Konen at 46:1–5, 47:21–48:4. The second company, Coastal Waste and Recycling

---

[2] In his email, Konen attached the inventory template "for review and comments if necessary." ECF No. 65-5 at 1. The attachment, titled "Total Loss Inventory.xlsx," was a blank Excel template with columns labeled "Qty," "Description," "Style Number," "Color," "Embellished/Un-Embellished," "Age," "Container Location," "Our Repl Cost Each," "Our Repl Allowed w/tax," "Depr %," "Amount of Depr," "ACV," and "Pic #." ECF No. 76-1. The template did not include a sample listing of damaged items with sample quantities, style numbers, colors, etc. *Id.* It also did not include columns that would have facilitated collecting information relevant to the valuation of Imported Goods and Sold Goods under the Policy. *See* Policy at 4 (providing that Imported Goods would be valued based on factors including "purchase price," "prepaid and/or guaranteed freight," and "import dut[ies]," while Sold Goods would be valued based on "selling price" and "un-incurred charges, costs[,] expenses[,] and discounts"); *see also* ECF No. 65-6 at 51:24–52:6 (Konen testifying that the template was "[j]ust a standard Excel sheet" that Belfor had used in the past).

("Coastal Waste"), provided dumpsters and waste hauling services during the inventorying process. Pl. 56.1 ¶ 28. Tokio Marine was not aware that Belfor retained Oceanside and Coastal Waste to do the inventorying and removal. *See* Quinn at 59:7–60:6, 73:21–25.

From March 7 to March 16, 2020, Oceanside's independent contractors inventoried the damaged goods under the supervision of Oceanside and Belfor, while Coastal Waste replaced the dumpsters on site as needed. *See* Pl. 56.1 ¶¶ 30–31. Oceanside's workers completed a handwritten inventory of the damaged goods as they worked. Konen at 47:21–48:4; ECF Nos. 65-10, 65-11. The handwritten inventory contained columns for "Qty," "Description," "Style Number," "Color," "Embellished/Un-Embellished Y/N," and "Container Location." *See* ECF No. 65-10 at 7.[3] At the end of each work day, Belfor provided a copy of the handwritten inventory to Theresa Poston, Exist's Chief Operating Officer. Def. 56.1 ¶ 28.

By the end of the inventorying process, the handwritten inventory comprised about fifty-four pages, each with anywhere from six to sixty-four entries. *See generally* ECF Nos. 65-10, 65-11. Most entries were generic, such as "t-shirt," "shirt," or "short," and each was associated with large quantities of damaged goods. *See* ECF No. 65-10 at 7. One page, for example, listed an entry for 1,368 embellished "t-shirt[s]" of "mix[ed] color" on one line, 2,106 embellished "t-shirt[s]" of "mix[ed] color" on another line, and so forth. ECF No. 65-11 at 12. Many of the "style numbers" associated with the entries were alphanumeric (*e.g.*, "LT9263" or "LS06062"), while others were just a few numbers (*e.g.*, "818" or "2400"), contained no numbers at all (*e.g.*, "W/D"), or were left blank. *Id.* at 12, 18. Some entries listed the same style number for products that were described quite differently, such as sweaters and leggings. Poston at 25:6–13. The handwritten inventory was paginated, and at least one page appears to be missing. *See* ECF No. 65-10 at 25–26. Although each

---

[3] Citations to the handwritten inventory are to the ECF page number.

sheet contained a line for the "Insured's Signature," none are signed. *See generally* ECF Nos. 65-10, 65-11.

C. Removal of Damaged Goods

Throughout the inventorying process, Coastal Waste removed dumpsters filled with Exist's damaged merchandise, emptied them at a transfer station, and brought empty dumpsters back to the warehouse. Pl. 56.1 ¶ 57; Chlimper Depo. ("Chlimper") at 43:8–12, ECF No. 65-8. The damaged merchandise was taken from the transfer station to a landfill. Pl. 56.1 ¶ 69. One day during the inventorying process, an Oceanside worker commented to Exist's Chief Operating Officer, Poston, that it was a "shame" that the clothes would be destroyed. Poston at 35:14–36:21.

On May 26, 2020, after the inventorying process was completed, Exist became aware that certain clothing items, which Exist believed were part of the damaged merchandise that Coastal Waste hauled from the warehouse, were available for sale at a local flea market. Pl. 56.1 ¶ 80; ECF No. 65-23. On June 2, 2020, Exist asked Belfor to certify that all of the damaged merchandise had been destroyed. Pl. 56.1 ¶ 65. In response, Coastal Waste provided a report listing the dates on which Coastal Waste hauled dumpsters from the warehouse and the total weight of the damaged merchandise it removed. *Id.* ¶ 66.

D. Adjustment of Exist's Claim

Belfor typed the handwritten inventory into a digital spreadsheet (the "Belfor Inventory"), Konen at 37:3–4, which it emailed to Wood on March 24, 2020, ECF No. 65-24. Although the Belfor Inventory represented a total of 294,496 damaged items, Pl. 56.1 ¶ 47, Tokio Marine's representative, Quinn, who testified that she "did not do a separate count" of the damaged merchandise, reported to Exist that the total count of the Belfor Inventory was 271,001 damaged items, Quinn at 127:4–5; ECF No. 65-14 at 2; Pl. 56.1 ¶ 46. After both parties raised concerns about the approximately 95,500-item discrepancy between the Exist Inventory and Tokio Marine's representation of the Belfor Inventory,

Tokio Marine provided Exist with a spreadsheet (the "Tokio Marine Inventory") that totaled 274,090 damaged items—an approximately 20,500 item-decrease from the Belfor Inventory and an approximately 92,000 item-discrepancy with the Exist Inventory. ECF No. 65-12 at 67.

From March 2020 to April 2021, Exist, its public adjuster Lopez, Tokio Marine, and Tokio Marine's accountant discussed issues concerning Exist's claim and the Tokio Marine Inventory. *See generally* ECF Nos. 65-13, 65-15. Tokio Marine's accountant requested that Exist provide additional information about its merchandise, directed Exist to sort Excel sheets on his behalf and segregate data by Imported Goods and Sold Goods, and told Exist that it was "Exist's burden to do this work" if Exist "want[ed] to be paid." ECF No. 65-13 at 33; *see, e.g.*, *id.* ("The assured needs to [sort] the sales by Item No. and not by customer[.]"); ECF No. 65-15 at 3 ("[D]id you segregate the items for those being claimed at cost and those at selling price[?]"); *id.* at 7 ("Specify which items in the claim are being claimed at cost and those at selling price."). By May 2020, Exist had provided Tokio Marine with customer purchase records prior to the flood, which did not include shipping costs, as well as a report of all unsold inventory in the warehouse as of December 18th, one day prior to the flood. *See* ECF No. 65-13 at 33; ECF No. 65-15 at 2, 4–5.

In October 2020, Lopez noted to Tokio Marine's representative Quinn that the Tokio Marine Inventory contained errors, making it impossible to cross-reference Exist's purchase and sale records with the damaged goods on the Tokio Marine Inventory. Specifically, Lopez claimed that "many entries" on the Tokio Marine Inventory contained style numbers that were invalid Exist style numbers, and "upon closer review ha[d] never been" style numbers "in [Exist's] system." ECF No. 65-13 at 23. Lopez claimed, for example, that "Belfor wrote LS06009 [when] it should have been LSO6009;" that "Belfor recorded incorrect or old style/product numbers instead of [the] new numbers that [were] being used;" and that "Belfor used [Exist's] vendor numbers in their [inventory] instead of using [Exist's style] numbers." *Id.* at 21.

Tokio Marine and Belfor did not dispute the errors.  *See, e.g.*, ECF No. 65-13 at 15 (email from Quinn to Lopez acknowledging that the Belfor Inventory contained "numerous entries for Leggings but [that Quinn could not] determine what the corresponding internal number [was] for [Exist]"); *id.* at 20 (Belfor representative stating that an error pointed out by Lopez "may be true"); *id.* (Belfor representative stating that an error pointed out by Lopez "could be an issue [of] transcribing on both or one of the two ends").  Instead, the parties disputed who was responsible for them.  Tokio Marine and Belfor suggested that Exist was responsible because an Exist representative had been present during the inventorying process and Oceanside's workers had followed Exist's instructions. *See id*. at 19–20, 22.  Exist disagreed, arguing that it was not consulted during the inventorying process and, if it had been, it would not have given incorrect information to Oceanside's workers. *See id.* at 18–19 (Lopez stating that none of the workers' questions during the inventorying process "related to how to identify or document clothing/products" (capitalization altered)); *see also id.* (Lopez stating that Exist "offered [the workers] Exist [style] catalogs as a reference point when the project initially began" (capitalization altered)); Konen at 45:6–17 (testifying that Exist's on-site employee assisted only with "access to the containers").

Ultimately, neither Tokio Marine nor Exist was able to match each entry on the Tokio Marine Inventory with Exist's purchase or sale records.  Pl. 56.1 ¶¶ 52–53; ECF No. 65-13 at 3.  On July 9, 2021, Tokio Marine made a final payment to Exist for a total of $1,014,035.40 on the claim.  Pl. 56.1 ¶ 54.  That total did not include payment for articles that Tokio Marine knew to be damaged but could not be matched to Exist's purchase or sale records.  Quinn at 107:10–19; *see id.* at 135:1–4; Def. Mem. at 14.

## II.    Procedural Background

Exist filed this action on February 28, 2022, asserting claims for breach of the Policy, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, fraud, civil

conspiracy to commit conversion, civil conspiracy to commit fraud, and a violation of New York

General Business Law ("GBL") § 349.  *See* Compl. ¶¶ 57–123.

By order dated January 9, 2024 (the "Order"), the Court held that Exist is entitled to a jury

trial on all of its claims.  *See generally* Order, ECF No. 57.  The Court found that, for the purposes of

the availability of a jury trial, admiralty law governs Exist's contract claims while state law governs

its tort claims.  *Id.* at 3.  Although claims governed by admiralty law are not entitled to a jury trial, the

Court found that Exist is entitled to a jury trial on its tort claims, and "because Exist's contract and

tort claims stem from the same alleged conduct, they may be adjudicated in a single jury trial."  *Id.*

## DISCUSSION

I.  <u>Legal Standard</u>

Summary judgment is appropriate when the record shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322–26 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could

return a verdict" for the nonmovant.  *Anderson*, 477 U.S. at 248.

The movant bears the initial burden of demonstrating the absence of a genuine dispute of

material fact by citing specific evidence in the record.  Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S.

at 323; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  If the nonmovant bears the

burden of proof at trial, the movant may satisfy its initial burden by demonstrating that the

nonmovant cannot produce admissible evidence to support the existence of a triable issue of material

fact.  *See Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir.

2002) (per curiam).  If the movant meets its initial burden, the burden shifts to the nonmovant to

establish a genuine dispute of material fact.  *See Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*,

315 F.3d at 105.  "Although a party opposing summary judgment need not prove its evidence in a

form admissible at trial or under the evidentiary standard which will be required, it must show facts sufficient to enable a reasonable mind to conclude that a material dispute of fact exists." *Healey v. Chelsea Res. Ltd.*, 736 F. Supp. 488, 491–92 (S.D.N.Y. 1990) (citation omitted). In deciding each cross-motion for summary judgment, the Court must view the record in the light most favorable to the nonmovant. *Koch*, 287 F.3d at 165.

II.    <u>Analysis</u>

A.   Breach of the Policy

Exist contends that there is no genuine dispute that Tokio Marine breached the Policy by failing to properly inventory and authenticate Exist's loss, pay Exist for all damaged merchandise, and destroy all items hauled away by Coastal Waste. Pl. Mem. at 11, 14, 17–18. Tokio Marine cross-moves for summary judgment on Exist's breach of contract claim. It argues that the claim is time-barred and, in the alternative, that Tokio Marine complied with the Policy by paying Exist for all damaged goods that could be matched to Exist's purchase and sale records. Def. Mem. at 6, 14. Tokio Marine further contends that it is not liable for any failure to destroy damaged merchandise because, under the Policy, the duty to destroy damaged merchandise fell on Exist. *Id.* at 15–16.

Applying New York contract law, the Court concludes that Exist is entitled to summary judgment on its breach of contract claim. The claim is timely and there is no genuine dispute that Tokio Marine failed to properly inventory Exist's loss, authenticate and adjust the claim, and pay Exist for all damaged goods. The Court agrees with Tokio Marine, however, that there is no genuine dispute that Tokio Marine complied with the Policy's provision regarding the destruction of damaged goods.

1.   Applicable Law

In the Order, the Court held that, for the purposes of admiralty jurisdiction, the Policy is a maritime contract. Order at 6. The Court observed, however, that "[d]eciding the merits of Exist's

contract claims would require a separate choice-of-law inquiry" because "the scope and validity of the marine insurance policy provisions" present a different choice-of-law question from whether the Policy is a maritime contract. *Id.* at 4 n.4 (citation omitted). In their summary judgment briefing, the parties appear to assume, without discussion, that New York law applies to Exist's contract claim. That assumption is correct.

In *Advani Enterprises, Inc. v. Underwriters at Lloyds*, the Second Circuit explained that the "scope and validity" of maritime contracts, as well as "the consequences of breaching them," are governed by state law as opposed to federal common law. 140 F.3d 157, 162 (2d Cir. 1998) (quoting *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 316 (1955)). To determine which state's law applies, the Court must assess the following factors:

> (1) any choice-of-law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

*Id.*

As to the first factor, the Court must give "considerable weight" to the parties' agreement that New York law would govern "interpretation of th[e] [P]olicy" in the absence of "U.S. federal maritime common law," and that Exist, "the party seeking to enforce the choice-of-law provision, did not draft the [P]olicy." *Id.*; *see* Policy at 51. The first factor, therefore, weighs in favor of applying New York law. As for the second factor, although the Court continues to lack sufficient information to determine where the Policy was negotiated, issued, and signed, as discussed in the Order, *see* Order at 6 n.5, there is some evidence that Tokio Marine endorsed the Policy in New York, *see* Policy at 7, 11, 13, 19, 21–22, 53 (indicating that Tokio Marine countersigned in New York). The second factor, therefore, weighs slightly in favor of applying New York law. As for the third factor, contract performance occurred in both New York and Florida because "premiums [were] billed and a claim on

11

the [P]olicy [was] made" in those states. *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135–36 (2d Cir. 2018) (citation omitted). The fourth factor, the location of the contract's subject matter, falls "primarily on navigable waters." Order at 6. And the fifth factor cuts in favor of applying either New York or Florida law because Tokio Marine is a New York corporation with its principal place of business in New York, whereas Exist is a Florida corporation with its principal place of business in Florida. Compl. ¶¶ 7–8.

In sum, although there are relevant contacts with both New York and Florida, the Florida contacts are "fewer and less important" than those with New York, particularly given the "considerable weight" which the Court must accord to the Policy's choice-of-law provision. *Advani*, 140 F.3d at 162–63. The Court finds, therefore, that New York law governs Exist's contract claim.

### 2. Timeliness

Under the Policy, "[n]o suit, action[,] or proceeding against [Tokio Marine] for the recovery of any claim shall be sustainable unless commenced within one year from the date of the happening of the accident out of which the claim arises." Policy at 51. Relying on this provision, Tokio Marine argues that Exist's breach of contract claim is time-barred. Def. Mem. at 6. Exist does not dispute that it brought this action more than one year after the December 19, 2019 flood. It argues, rather, that the Policy's "Notice of Suit" provision is "unreasonable and unenforceable" because Tokio Marine did not finalize the adjustment of Exist's claim until July 2021, more than one year after the flood, precluding Exist from challenging the adjustment as a breach of the Policy. Pl. Mem. at 26–28 (quoting *Exec. Plaza, LLC v. Peerless Ins. Co.*, 22 N.Y.3d 511, 516 (2014)); Pl. 56.1 ¶ 54.

In *Executive Plaza*, the Second Circuit certified to the New York Court of Appeals the question of whether a two-year limitation period in a fire insurance policy could be enforced if the policy required the insured to replace destroyed property before making a claim, and the process of replacing the property could not reasonably occur within the limitation period. *See* 22 N.Y.3d at

516–18.  The Court of Appeals held that such a contractual limitation period is unenforceable.  *Id.* at 516, 518.  The Court explained that, although "there is nothing inherently unreasonable about a two-year period of limitation" or a shorter period of one year, such periods may be unenforceable in "the circumstances of [a] particular case."  *Id.* at 518–19 (citation omitted).  If the imitation period requires a party to bring suit within a period of time after its loss "while imposing a condition precedent to the suit . . . that cannot be met within that [limitation] period," it is "neither fair nor reasonable" to enforce such a provision, which is effectively a "nullification of the claim."  *Id.* at 518.

Tokio Marine contends that nothing in the Policy prevented Exist from filing its suit within one year of the flood; the Policy did not require Exist to replace damaged property, for example, or to take any other steps before bringing suit.  Def. Mem. at 8–9.  It is clear, however, that the Policy's one-year limitation assumes the existence of a cause of action for breach of the Policy "within one year from the date of the happening of the accident."  Policy at 51.  Because Tokio Marine took more than one year after the flood to authenticate the loss and adjust Exist's claim, that condition precedent was not satisfied within the Policy's limitation period.  *See* Pl. 56.1 ¶ 54.  Until Tokio Marine finalized its adjustment, Exist lacked any factual basis, concrete injury, or knowledge of damages sufficient to support a cause of action for breach of the Policy based on Tokio Marine's allegedly improper adjustment.  Exist's claim was, in effect, "time-barred before it [came] into existence."[4] *Exec. Plaza*, 22 N.Y.3d at 516.  Under the circumstances, it would be "neither fair nor reasonable" to enforce the Policy's one-year limitation period.  *Id.* at 518.  To conclude otherwise would allow any insurer to unilaterally bar claims for breach of an insurance policy by simply delaying the authentication and adjustment of an insured's claim.

---

[4] Tokio Marine rejects as a purely "unfounded hypothetical[]" that it would have moved to dismiss as unripe any lawsuit filed prior to the adjustment of the claim.  Def. Reply at 3–4.  But whether Tokio Marine would have moved to dismiss any such lawsuit is irrelevant.  Regardless of Tokio Marine's actions in a hypothetical lawsuit, adjustment was a condition precedent for any cause of action challenging the adjustment as a breach of the Policy.

The Policy provides that, "if [its] limitation [provision] is invalid by the laws of the state within which the [P]olicy is issued[,] then such suit, action[,] or proceeding shall be barred unless commenced within the shortest limit of time permitted by the laws of such state." Policy at 51. In New York, breach of contract claims are subject to a six-year statute of limitations and accrue when the contract is breached. N.Y. C.P.L.R. § 213(2). Because Exist filed its suit within six years of the accrual date, its claim is timely.

### 3. Liability

#### a. Improper Adjustment and Payment of the Claim

Exist argues that there is no genuine dispute that Tokio Marine failed to reasonably investigate Exist's claim, made errors in the claim-adjustment process, and failed to pay Exist for goods that Tokio Marine knew to be damaged—all in breach of the Policy. *See* Pl. Mem. at 10–17. The Court agrees.

Under the Policy, Exist, as the insured, had the duty to give Tokio Marine "prompt notice" of any "loss which may give rise to a claim under th[e] Policy." Policy at 47. Tokio Marine, as the insurer, retained the right to "authenticate[]" the loss and adjust Exist's claim, and it bore the duty, in the "case of loss," to make a full payment to Exist "[with]in thirty days after proof of loss, proof of interest, and adjustment, thereof." *Id.* at 24, 47.

There is no dispute that Exist gave Tokio Marine prompt notice of its loss following the flood and made its claim for approximately $2.6 million in damaged merchandise in good faith. *See* Quinn at 45:4–17. Nor do the parties dispute that, after receiving notice of Exist's claim, Tokio Marine exercised its right to authenticate the proof of loss by retaining Wood and later Belfor to inspect and inventory the damaged merchandise for the purposes of valuation and adjustment.

Exist contends, and the Court agrees, that Tokio Marine's flawed inventorying and adjustment process caused Tokio Marine to breach the Policy. Pl. Mem. at 12–16. There is no genuine dispute

14

that the handwritten inventory created by Oceanside's independent contractors is partially illegible, missing at least one page, and includes "style numbers" that were improperly transcribed, missing, inconsistent, or incorrectly taken from third-party or outdated vendor numbers rather than Exist's current style numbers. That inventory was typed into a digital spreadsheet, which Belfor provided to Tokio Marine, totaling 294,496 damaged items. Pl. 56.1 ¶ 47. Without doing "a separate count" or altering the Belfor Inventory in "any way," Tokio Marine used the Belfor Inventory to create the Tokio Marine Inventory, which inexplicably reduced the total number of damaged items from 294,496 to 274,090—a discrepancy of approximately 20,500 items that Tokio Marine has never explained. Quinn at 85:2–5, 127:4–5; ECF No. 65-14 at 2; Pl. 56.1 ¶ 46.

Tokio Marine points to no evidence placing these facts in genuine dispute. It argues, rather, that Exist shares in the responsibility for the Tokio Marine Inventory because Exist failed to review and object to the handwritten tally of damaged goods during the inventorying process despite having the opportunity to do so. *See* Def. Mem. at 14–15. In Tokio Marine's view, "both Exist as the assured and Tokio Marine[] as the insurer had a duty to properly adjust" the claim. *Id.* at 14. But, Tokio Marine points to no provision of the Policy, caselaw, or statute to support its argument. The Policy did not contain a "cooperation clause" requiring Exist "to cooperate with its insurer in the investigation of a covered incident." *Ebrahimian v. Nationwide Mut. Fire Ins. Co.*, 960 F. Supp. 2d 405, 415 (E.D.N.Y. 2013) (quoting 70A N.Y. Jur. 2D Ins. § 2122). Thus, Tokio Marine, as the insurer, was obligated under New York law to base any denial of payment on a reasonable investigation that *it* conducted in good faith. *See McGettrick v. Fid. & Cas. Co. of N.Y.*, 264 F.2d 883, 886 (2d Cir. 1959); *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 194 (2008). Consistent with that obligation, the Policy provided that Tokio Marine—not Exist—was responsible for authenticating the loss and adjusting the claim. *See* Policy at 24, 47; *see also U.S. Underwriters Ins. Co. v. City Club Hotel, LLC*, 369 F.3d 102, 107 (2d Cir. 2004) (noting that the

insurer "has an obligation to engage in a 'reasonably prompt, thorough, and diligent investigation of the claim'" (quoting *Prudential Prop. & Cas. Ins. Co.*, 623 N.Y.S.2d 336, 336 (App. Div. 1995)).

Tokio Marine's actions or omissions made it impossible for it to fulfill its obligations under the Policy. Tokio Marine engaged Wood "to act as [its] eyes and ears . . . [and] report back on [the] damages" that Exist suffered during the flood. Quinn at 56:18–21. Wood, in turn, "recommended Belfor . . . to Tokio Marine," which retained Belfor as a subcontractor to inspect and inventory the damaged merchandise. *Id.* at 57:18–23, 59:2–3; *see* Konen at 44:14–21, 80:16–19. Belfor then subcontracted with a third company, Oceanside, to perform the inventorying process without Tokio Marine's knowledge or oversight. Quinn at 59:7–60:6, 73:21–25; Konen at 46:1–5; Carr at 24:15–25:12; 30:3–7; 48:18–25. Oceanside then employed "independent contractors" to tally the damaged goods and create the handwritten inventory. Konen at 47:21–48:4 (testifying that Oceanside workers took "the pieces out [of the containers]," "stage[d] them," and "actually handwrote the inventory"); Carr 26:4–10, 35:7–20, 36:6–15. In other words, Tokio Marine outsourced its Policy obligations to a contractor (Wood), who recommended that Tokio Marine retain a subcontractor (Belfor), which outsourced its delegated obligations to a sub-subcontractor (Oceanside), which then relied upon independent sub-sub-subcontractors to carry out Tokio Marine's duties without Tokio Marine's knowledge or oversight.

The resulting Tokio Marine Inventory—inexplicably altered by Tokio Marine from the indisputably flawed Belfor Inventory—contained entries representing thousands of damaged items that could not be reconciled with Exist's internal records. *See* Quinn at 86:22–87:21. To Oceanside's knowledge, neither Tokio Marine, Wood, nor Belfor investigated how Oceanside's independent contractors prepared the handwritten inventory either before or after Exist identified errors in the Belfor and Tokio Marine Inventories. *See* Carr at 46:3–6, 47:7–16. Instead, Tokio Marine insisted that the fault lies with Exist for failing to produce records sufficient to determine the value of all

goods listed in the Tokio Marine Inventory.  *See* Def. Mem. at 13–14.  Tokio Marine does not

dispute, however, that Exist provided Tokio Marine with purchase records for up to three months

before the flood; informed Tokio Marine that those records did not include shipping costs; and gave

Tokio Marine a report of all unsold inventory in Exist's warehouses as of one day prior to the flood.

*See* ECF No. 65-13 at 33; ECF No. 65-15 at 2, 4–5.  Had Tokio Marine recorded accurate style

numbers and descriptions of damaged goods, the information Exist provided apparently would have

been sufficient to value the products under the terms of the Policy as Imported Goods or Sold Goods,

*see* Policy at 4, as Tokio Marine was able to do for up to $1,014,035 of inventoried damaged goods,

Pl. 56.1 ¶ 54.

Ultimately, there is no genuine dispute that Tokio Marine paid Exist zero dollars for

merchandise that Tokio Marine knew to be damaged because it could not cross-reference the

merchandise with Exist's internal records due to errors in the Tokio Marine Inventory.  *See* Quinn at

86:22–87:21, 107:10–19, 135:1–4; *see also* Def. Mem. at 14.  Therefore, there exists no triable issue

as to whether Tokio Marine breached the Policy by failing to properly authenticate Exist's loss,

accurately adjust Exist's claim, and pay Exist for all of its covered losses.

### b.   Destruction of Damaged Goods

Exist is not entitled to summary judgment on its claim that Tokio Marine breached the Policy

by failing to destroy all damaged goods.  Under the Policy, "in the event of damage to goods," the

"Assured shall retain control of all damaged goods."  Policy at 46.  The Policy further states that,

"[w]here it is agreed by both the Assured and the Company that the disposal or sale of such damaged

goods is detrimental to the Assured's interest[,] . . . such damage will be treated as a constructive total

loss, and the goods shall be destroyed in the presence of a representative of the Company."  *Id.*

Although Exist initially argued at summary judgment that the Policy should be read to define the

"Company" as Exist rather than Tokio Marine, it withdrew that argument in its reply brief.  *See* Pl.

Mem. at 18; Pl. Reply at 7 n.5.  Indeed, the Policy plainly defines the "Company" as "Tokio Marine America Insurance Company" and the "Insured" or "Assured" as "Exist, Inc."  Policy at 2, 7.

Accordingly, the plain and unambiguous reading of the Policy's "Control of Damaged Goods Clause" provides that Exist was to "recondition and sell" damaged goods or, with the agreement of Tokio Marine, "destroy[]" the goods "in the presence of a representative of" Tokio Marine.  *Id.* at 46. Exist emphasizes, nevertheless, that "Coastal Waste was never given any instructions as to what it was supposed to do with the merchandise . . . prior to hauling it away," Pl. 56.1 ¶ 60, and that certain damaged goods were not destroyed but instead taken to a landfill or a local flea market, *id.* ¶¶ 72, 80, 83.  Whether disputed or not, such allegations are immaterial to Tokio Marine's liability because Exist—not Tokio Marine—bore the ultimate duty to ensure that the goods were destroyed.  It was not Tokio Marine's responsibility to monitor how the goods were handled after they were hauled from Exist's warehouse.  Therefore, there exists no triable issue of fact as to whether Tokio Marine breached the Policy by failing to ensure that damaged goods were destroyed.

### c.  Implied Covenant of Good Faith and Fair Dealing

Exist contends that Tokio Marine breached the implied covenant of good faith and fair dealing by improperly adjusting the claim and failing to pay Exist for all of its covered losses.  *See* Pl. Mem. at 11–16.  Under New York law, every contract contains an implicit covenant of good faith and fair dealing.  *See JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022). However, "to avoid redundancy, claims of breach of the implied covenant must be premised on a distinct set of facts from those underlying a claim for breach of contract."  *Polcom USA, LLC v. Affiliated FM Ins. Co.*, 551 F. Supp. 3d 290, 297 (S.D.N.Y. 2021).  A claim for breach of the implied covenant will therefore be "dismissed as redundant where the conduct allegedly violating the implied

covenant is also the predicate for breach of . . . an express provision of the underlying contract." *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299 (S.D.N.Y. 2012) (citation omitted).

Exist argues that Tokio Marine breached the implied covenant "by doing an inadequate job in inventorying the damaged goods, resulting in a drastic underpayment to Exist." Pl. Reply at 25–26. Because that conduct is the predicate of Tokio Marine's breach of the Policy's express provisions concerning adjustment, valuation, and payment, the Court dismisses Exist's claim for breach of the implied covenant of good faith and fair dealing as redundant. *See, e.g.*, *Fleisher*, 858 F. Supp. 2d at 299.

### d. Compensatory and Consequential Damages

Exist seeks both compensatory and consequential damages for Tokio Marine's breach of the Policy. *See* Pl. Mem. at 20; Compl. ¶ 67. Compensatory damages for breach of an insurance policy are generally calculated based on the dollar amount of the covered loss. *See Bi-Econ. Mkt., Inc.*, 10 N.Y.3d at 192. Consequential damages, "which do not so directly flow from the breach, are . . . recoverable in limited circumstances," and only if such "unusual or extraordinary damages" were "within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Id.* (citations omitted).

Exist claims $1,607,917.31 in compensatory damages, which represents the difference between Exist's original claim of $2,621,952.71 in damaged goods and Tokio Marine's total payment of $1,014,035.40 under the Policy. Pl. Mem. at 20; Compl. ¶ 67. Triable issues of fact preclude the Court, however, from awarding Exist compensatory damages at the summary judgment stage. Exist's original claim of $2,621,952.71 in covered losses was derived from the Exist Inventory, which totaled 366,411 damaged items. Pl. 56.1 ¶¶ 15–16. That inventory tallied each item's cost and its retail value (*i.e.*, selling price). *See generally* ECF No. 65-4. Apparently relying solely on the items' retail value, Exist calculated a "total retail value" of $2,621,952.71 in losses. *Id.* at 14; Pl. 56.1 ¶ 16.

19

Under the Policy, however, only Sold Goods are to be valued based on selling price—and only after subtracting "un-incurred charges, costs[,] expenses[,] and discounts."  Policy at 4.

Exist has not established that all items on the Exist Inventory qualify as Sold Goods under the Policy or that the Exist Inventory accounted for un-incurred charges, costs, expenses, or discounts for merchandise that do qualify.  Nor has Exist established the absence of genuine factual disputes regarding the total number of goods damaged.  Although the Belfor and Tokio Marine inventories suffered from critical flaws, Exist does not dispute that each tallied only 294,496 and 274,090 damaged goods, respectively, and neither party has offered undisputed evidence resolving the discrepancy in total numbers between the various inventories.  Both the extent and the value of the covered loss are genuinely disputed.  Therefore, the Court cannot find that Exist is entitled, as a matter of law, to $1,607,917.31 in compensatory damages.

For the same reason, the Court cannot award Exist the $9,733,439.23 it seeks in consequential damages.  That figure represents the return that Exist claims it would have received on an investment of the $1,607,917.13 it believes it was underpaid.  *See* ECF No. 67-1 at 2; Pl. Mem. at 20.  As stated, the parties genuinely dispute the extent and value of the covered loss.  Accordingly, the Court cannot find that Exist is entitled, as a matter of law, to $9,733.439.23 in consequential damages.[5]

### B.  Unjust Enrichment

Exist claims that Tokio Marine is liable for unjust enrichment because it or its agents were "enriched through the sale of Exist's damaged merchandise at flea markets."  Compl. ¶ 93.  The

---

[5] Tokio Marine seeks summary judgment on Exist's claim for consequential damages, arguing that the affidavit Exist submitted to establish its business rate of return is "shameless[]," "fantastical," and "unsupported."  Def. Mem. at 19.  The affidavit in question was sworn by Shaul Ashkenazy, Vice President of Exist, based upon Ashkenazy's personal knowledge and belief.  *See* ECF No. 67-1 at 1.  Tokio Marine did not depose Ashkenazy despite having the opportunity to do so, and the Court finds that Ashkenazy is competent to testify on the matters at issue, and that his affidavit sets out facts that would be admissible at trial.  *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219, 231 (S.D.N.Y. 2021) (citing Fed. R. Civ. P. 56(c)(4)).  The Court, therefore, denies Tokio Marine's motion for summary judgment as to consequential damages.  Tokio Marine will have the opportunity to cross-examine Exist's witnesses at trial.

Court agrees with Tokio Marine that Exist has failed to adduce evidence sufficient for a reasonable juror to find that Tokio Marine or any of the other relevant entities unlawfully took possession of, sold, or retained the benefit of selling Exist's damaged merchandise. *See* Def. Mem. at 26–27.

At most, the evidence adduced by Exist establishes that one Oceanside worker told an Exist employee that it was a "shame" the clothes would be destroyed, Pl. 56.1 ¶ 79; that an Exist employee observed on one occasion that the clothes placed by Oceanside "in one dumpster . . . seemed to be more stacked" than the clothes in another dumpster, which "were just thrown" in, Poston at 34:2–21; that Coastal Waste sent Exist's damaged merchandise to a landfill rather than incinerating or otherwise destroying the goods, Pl. 56.1 ¶ 72; that before the goods were sent to the landfill, Coastal Waste dropped the damaged goods at a "transfer station" where Coastal Waste processes debris and recycles construction materials before sending waste on to landfills, Chlimper at 38:12–39:10; that Oceanside considered Exist's damaged merchandise to be "waste" with "no recycling property," *id.* at 39:6–10; and that Exist later found some of its damaged merchandise for sale at a local flea market, Pl. 56.1 ¶ 80.

It would require impermissible "conjecture or surmise" to conclude on the basis of such evidence that Tokio Marine or any of the other relevant entities unlawfully took possession of Exist's damaged merchandise, sold the merchandise, or retained the benefit of such a sale at Exist's expense. *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (citation omitted). Accordingly, the Court finds that Tokio Marine is entitled to summary judgment on Exist's claim of unjust enrichment.

## C.  Tort Claims

Exist's claims of conversion, fraud, civil conspiracy to commit conversion, and civil conspiracy to commit fraud arise from the same operative contention that Tokio Marine, Belfor,

Oceanside, or Coastal Waste unlawfully took possession of Exist's damaged merchandise and sold it on a secondary market. These claims fail for largely the reasons already discussed.

       1.   Applicable Law

As an initial matter, the Court must determine which law applies to Exist's tort claims. The Court previously held that "admiralty law does not apply to Exist's tort claims." Order at 8. The Court did not determine, however, which state's law would apply on the merits. *See id.* at 7–8. Without analyzing the issue, both parties incorrectly assume that New York law applies. *See generally* Pl. Mem.; Def. Mem.; Pl. Reply; Def. Reply.

"[A] federal court sitting in diversity applies the law of the forum state." *Velez v. Sebco Laundry Sys., Inc.*, 178 F. Supp. 2d 336, 339 (S.D.N.Y. 2001) (first citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); then citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938); and then citing *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)). "Under New York law, a choice-of-law provision indicating that the [parties'] *contract* will be governed by a certain body of law does not dispositively determine that law which will govern a claim of *fraud* arising incident to the contract." *Krock*, 97 F.3d at 645 (emphasis in original). Because the Policy's choice-of-law provision (and the corresponding disclaimer of "any principles of choice of law") governs only "interpretation of th[e] [P]olicy" and the parties' "rights and obligations" under the Policy, Policy at 51, the provision is not "sufficiently broad" to cover disputes sounding in tort such as Exist's claims of conversion or fraud, *Krock*, 97 F.3d at 645. In such circumstances, New York choice-of-law rules require the Court to apply the interest-analysis framework, under which "the law of the jurisdiction having the greatest interest in the litigation" applies. *Id.* (cleaned up) (citation omitted). "[B]ecause the case at hand concerns laws regulating allegedly fraudulent conduct" and "the parties are domiciled in different states," the "proper body of law to be applied" under interest analysis "turns on the locus of the tort." *Id.* at 646. Here, that locus is Florida, where both the alleged tortious acts and

Exist's alleged injuries occurred. *See id.*; Def. Mem. at 26 ("[T]he supposed misconduct took place in Florida."); Def. Reply at 13 ("[T]he Claim itself occurred in Florida and the alleged re-sale of the goods is said to have occurred in Florida.").  The Court finds, therefore, that Florida law governs Exist's tort claims.[6]

### 2.  Merits

Exist alleges that Tokio Marine or its agents converted or conspired to convert Exist's damaged merchandise by taking or agreeing to take it for resale without authorization. *See* Pl. Reply at 18–19.  Exist further alleges that Tokio Marine or its agents committed fraud or conspired to commit fraud by falsely representing, or agreeing to falsely represent, that all of the damaged items were destroyed when in fact they were sent to a landfill or resold. *Id.* at 20.  The Court agrees with Tokio Marine that the evidence does not reasonably support a finding of conversion, fraud, or civil conspiracy to commit either tort.

A claim of conversion requires a plaintiff to establish "[a] taking with intent to exercise an ownership inconsistent with the owner's right of possession." *Wilson Cypress Co. v. Logan*, 120 Fla. 124, 127 (1935).  A claim of fraud requires a plaintiff to establish "(1) [a] false statement concerning a material fact[;] (2) [k]nowledge by the person making the statement that the representation is false[;] (3) [t]he intent by the person making the statement that the representation will induce another to act on it[; and] (4) [r]eliance on the representation to the injury of the other party." *Tucker v. Mariani*, 655 So. 2d 221, 225 (Fla. Dist. Ct. App. 1995) (citing *Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984)).  To establish a civil conspiracy to commit a tort, a plaintiff must demonstrate (1) "a conspiracy between two or more parties"; (2) "to do an unlawful act or to do a lawful act by unlawful means"; (3) "the doing of some overt act in pursuance of the conspiracy"; and (4) "damage

---

[6] Even if the Court concluded that New York law, and not Florida law, governed Exist's tort claims, its analysis of the merits of those claims would not change.

to [the] plaintiff as a result of the acts performed pursuant to the conspiracy." *Kurnow v. Abbott*, 114 So. 3d 1099, 1102 n.4 (Fla. Dist. Ct. App. 2013) (emphasis omitted).

A reasonable juror could not conclude based on the record that Tokio Marine or any of the relevant entities took possession of Exist's damaged merchandise without authorization and resold it. Nor has Exist adduced evidence sufficient for a juror to conclude that Tokio Marine or any relevant entity made a knowingly false statement regarding the damaged goods or intended to induce Exist to rely upon such a statement. At most, the evidence shows that, on March 9, 2020, Belfor told Exist it would provide "a Certificate of Destruction" from Coastal Waste, in addition to the "weigh[t] tickets from the dumpsite when the project is complete." ECF No. 65-21 at 3. On March 12, 2020, Coastal Waste informed Belfor that Coastal Waste would "be hauling all debris from [Exist's warehouse] to the landfill for destruction and disposal and [would] provide scale tickets detailing the weights of these loads at the end of the job for [Belfor's] records." ECF No. 65-20 at 3. On June 2, 2020, Exist followed up with Belfor to request "certificates certifying that the inventory was in fact destroyed," which Belfor forwarded to Coastal Waste. ECF No. 65-21 at 2–3. And Coastal Waste, in turn, supplied an "Activity Report" that summarized the dates and tonnage of materials removed from Exist's property. ECF No. 65-19.

Such evidence could not reasonably support the conclusion that Belfor, Coastal Waste, or any relevant entity or individual intentionally misled Exist as to the fate of its damaged merchandise. To the contrary, the evidence shows that Exist was on notice as early as March 9 that the manner of destruction was removal to a "dumpsite." ECF No. 65-21 at 3. Nor could the evidence reasonably establish that any relevant entity or individual agreed to engage in conversion or fraud, took steps in furtherance of such an agreement, and damaged Exist as a result. Accordingly, the Court finds that Tokio Marine is entitled to summary judgment on Exist's claims of conversion, fraud, civil conspiracy to commit conversion, and civil conspiracy to commit fraud.

D.  GBL § 349

For its final claim, Exist contends that Tokio Marine violated GBL § 349's prohibition on "'[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service' within [New York]." *Hochfelder v. Pac. Indem. Co.*, No. 22 Civ. 2012, 2023 WL 2430497, at *3 (S.D.N.Y. Mar. 9, 2023) (quoting GBL § 349(a)); *see also Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 (2002).  To demonstrate a violation of § 349, Exist must establish that Tokio Marine "engaged in conduct that was (1) consumer oriented; (2) deceptive or misleading in a material way; and (3) the plaintiff suffered injury as a result." *Hochfelder*, 2023 WL 2430497, at *3 (citation omitted).

The parties dispute whether any of the deceptive or misleading conduct that Exist alleges actually occurred within New York for the purposes of § 349.  *See* Def. Mem. 25–26; Pl. Reply at 22–23.  The issue is irrelevant, because even if all the alleged conduct occurred within New York, the evidence does not reasonably support a finding that Tokio Marine or any relevant entity engaged in conduct that was materially "deceptive or misleading." *Hochfelder*, 2023 WL 2430497, at *3 (citation omitted).  Exist's conclusory statements to the contrary are insufficient to meet its burden at summary judgment.  Accordingly, the Court concludes that Tokio Marine is entitled to summary judgment on Exist's claim under GBL § 349.

E.  Punitive Damages

Finally, Tokio Marine contends that Exist has not established entitlement to punitive damages. Def. Mem. at 18–21.  The Court agrees.  Under New York law, the standard for awarding punitive damages in insurance actions "is a strict one . . . available only in a limited number of instances." *Rocanova v. Equitable Life Assurance Soc'y of the U.S.*, 634 N.E.2d 940, 944 (N.Y. 1994) (citations omitted).  "[A] private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a

pattern of similar conduct directed at the public generally." *Id.* When an action is "grounded on a

breach of contract and the plaintiff fail[s] to state any tort outside of the contract," punitive damages

are unavailable. *Ebrahimian*, 960 F. Supp. 2d at 417; *see N.Y.U. v. Cont'l Ins. Co.*, 662 N.E.2d 763,

767 (N.Y. 1995) ("Where a lawsuit has its genesis in the contractual relationship between the parties,

the threshold task for a court considering . . . punitive damages is to identify a tort independent of the

contract."). Because the Court has granted Tokio Marine's motion for summary judgment with

respect to each of Exist's tort claims, Exist cannot as a matter of law establish "egregious tortious

conduct by which [it] was aggrieved." *Rocanova*, 634 N.E.2d at 944.

## CONCLUSION

For the reasons stated, the Court GRANTS Exist's motion for summary judgment on its

claim of breach of the Policy; DISMISSES Exist's claim of breach of the implied covenant of good

faith and fair dealing; GRANTS Tokio Marine's motion for summary judgment as to Exist's

claims of unjust enrichment, fraud, conversion, civil conspiracy to commit fraud, civil conspiracy

to commit conversion, GBL § 349, and Exist's request for punitive damages; and DENIES the

parties' motions in all other respects. The parties shall proceed to a trial on the compensatory and

consequential damages owed to Exist as a result of Tokio Marine's breach of the Policy.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 63 and 69–

74.

SO ORDERED.

Dated: January 21, 2025
       New York, New York

_____
        ANALISA TORRES
     United States District Judge